JARED S. PETTINATO, MT Bar No. 7434
The Pettinato Firm
3416 13th St. NW, #1
Washington, DC 20010
(406) 314-3247
Jared@JaredPettinato.com
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| CITIZENS FOR CONSTITUTIONAL INTEGRITY; and SOUTHWEST ADVOCATES, INC., | Case No. |
| Plaintiffs, | COMPLAINT AND PETITION FOR REVIEW OF AGENCY ACTION |
| v. | |
| THE UNITED STATES OF AMERICA; THE OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT; DAVID BERNHARDT, Department of the Interior Secretary, in his official capacity; LANNY ERDOS, Acting Director of the Office of Surface Mining Reclamation and Enforcement, in his official capacity; and CASEY HAMMOND, Acting Assistant Secretary for Land and Minerals Management, in his official capacity; | |
| Defendants. | |

**INTRODUCTION**

1. Fifty-one does not equal sixty. By setting two, unequal thresholds for passing bills in the Congressional Review Act[1] and in the Senate's Cloture Rule,[2] commonly known as the filibuster, Congress violated equal protection, substantive due process, and the separation of powers. Under that unconstitutional, two-tiered voting threshold, Congress passed one law that undermined environmental protections at the King II Mine (the Mine), a coal mine in southwestern Colorado. By implementing that unconstitutional law, the Office of Surface Mining Reclamation and Enforcement (OSMRE) violated the Constitution and the Stream Protection Rule, 81 Fed. Reg. 93,066 (Dec. 20, 2016), and failed to ensure the Mine would not impact local residents' well water, wildlife, groundwater, and the La Plata River.

2. In the striking, dry, high-desert of southwestern Colorado, the Mine takes water from the La Plata River, one of the few local, perennial streams, to control the dust as miners delve deeper into poorly understood geologic formations. The Mine's owner, GCC Energy, LLC, does not know what happens to fluids that flow out of the Mine, and it does not know how digging

---

[1] Section 251 of the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat 847, 868 (codified at 5 U.S.C. §§ 801-808) (Mar. 29, 1996).

[2] Rule 22.2, Standing Rules, Orders, Laws, And Resolutions Affecting the Business of the United States Senate (113th Cong., 1st Sess.), gpo.gov/senatemanual.

the coal will impact underground water flows. The Mine extracts coal above-grade of Southwest Advocates, Inc.'s, members' wells. GCC is failing to monitor the groundwater sufficiently to ensure pollutants are not mixing with the underground water, which supplies community members' wells. These failures flow from OSMRE's failure to require GCC to comply with the Stream Protection Rule.

3. Citizens rely on their government agencies to protect them from coal mining pollution and to protect them from coal mines otherwise damaging their ecosystems. Here, the Stream Protection Rule required OSMRE and GCC to complete a more thorough analysis of the groundwater before approving the Modification, and the rule required more monitoring for pollutants after approving the Mine. It also required more analysis of the hydrologic impacts from diverting La Plata River water to the Mine and away from irrigated cropland.

4. Despite the clear and present danger to this fragile ecosystem, where one drop of pollution spreads farther and lasts longer, OSMRE approved the Modification without complying with the Stream Protection Rule. Mine Approval for the Mining Plan Modification at the King II Mine (the Mine Approval), Ex. 1. OSMRE will likely approve a second expansion, called the Dunn Ranch lease, very soon.

5. OSMRE did not follow the Stream Protection Rule because, it contends, Congress rescinded the statutory basis for the rule, so the rule no longer has any effect. [OSMRE] Congressional Nullification of the Stream Protection Rule Under the Congressional Review Act, 82 Fed. Reg. 54,924 (Nov. 17, 2017); Act of Feb. 16, 2017, Pub. L. No. 115-5, 131 Stat. 10. OSMRE, however, is failing to implement the Constitution to recognize Congress's action as void.

6. To rescind the Stream Protection Rule, Congress relied on the unconstitutional Congressional Review Act (the Review Act). *See id.* Through enabling statutes, Congress delegates authorities to agencies. The Review Act allows Congress to withdraw those statutory delegations with simple-majority votes in each House and with the President's signature. The Review Act facially violates the Constitution in three ways.

7. First, the Review Act and the Cloture Rule, together, violate equal protection. The Review Act allows Congress to rescind delegations to agencies with fifty-one votes, while the Cloture Rule prohibits other legislation from passing the Senate without sixty votes. The Review Act unequally protects citizens without advancing any important, or even legitimate, government objective.

8. Second, the Review Act violates substantive due process under the Fifth Amendment because it establishes no rational relationship to any legitimate objective.

9. Third, the Review Act and the Senate Cloture Rule, XXII, together violate the separation of powers by creating a one-way ratchet for in which Congress to rescind Executive-Branch authorities more easily than expand them.

10. Acts contrary to the Constitution are void. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Because Congress used an unconstitutional procedure to withdraw the Stream Protection Rule, the withdrawal is void. 131 Stat. 10. Consequently, the Stream Protection Rule remains in force, and OSMRE violated the Constitution, Surface Mining Control and Reclamation Act of 1977 (SMCRA), Pub. L. No. 95-87, 91 Stat. 445 (codified at 30 U.S.C. §§ 1201-1328), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, by failing to apply it to the Mine Approval.

11. The Review Act closely relates to two other statutes that violated the Constitution. The Supreme Court voided Congress's first attempt at an expedited legislative veto. *INS v. Chadha*, 462 U.S. 919 (1983). It also voided the Line-Item Veto Act, which Congress had initially included in the bill with the Congressional Review Act. *Clinton v. City of New York*, 524 U.S. 417, 440

(1998).[3] Congress passed the two bills separately within two weeks of each other. The unconstitutional provisions in the Review Act merely lay dormant longer.[4]

12. No doubt, this case presents difficult questions of thorny constitutional dimensions. Nevertheless, courts do not shy from reviewing congressional rules for compliance with the Constitution when those rules affect individual citizens. When "the construction [of Senate] rules affects persons other than members of the Senate, the question presented is of necessity a judicial one." *United States v. Smith*, 286 U.S. 6, 29, 33 (1932).

13. This situation calls upon this Court to follow Chief Justice John Marshall's direction to proceed to answering the Constitutional issue despite any doubts, complexities, or difficulties that may arise:

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid, but we

---

[3] *See* Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat 847, 847 (Mar. 29, 1996) ("To provide for enactment of the . . . Line Item Veto Act,"); Line Item Veto Act, Pub. L. No. 104-130, 110 Stat. 1200 (Apr. 9, 1996).

[4] Until 2017, Congress used the Review Act only once: to rescind statutory authority for an ergonomics program. MAEVE P. CAREY & CHRISTOPHER M. DAVIS, CONG. RESEARCH SERV., R43992 THE CONGRESSIONAL REVIEW ACT: FREQUENTLY ASKED QUESTIONS 25 (Updated Jan. 14, 2020).

> cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens v. Virginia*, 19 U.S. 264, 404 (1821). In other words, the Constitution assigned this Court a duty to determine compliance with the Constitution's constraints—and that duty attaches when, like here, Congress's internal rules affect individual citizens. *See id.*; *Smith*, 286 U.S. at 29.

14. SMCRA and the APA require the Court to vacate and to set aside the Mine Approval until OSMRE complies with the Stream Protection Rule. That will require all work under the Mine Approval to stop.

## CAUSE OF ACTION, JURISDICTION, AND VENUE

15. United States Code Title 28, sections 1331 and 1361, assign this Court jurisdiction over this case both because the case presents a federal question and because it names the United States as a defendant. *See Califano v. Sanders*, 430 U.S. 99, 105 (1977).

16. SMCRA's citizen suit provision grants this Court jurisdiction because Southwest Advocates will be adversely affected by the Secretary of the Interior's and OSMRE's failures to apply the Stream Protection Rule. *See* 30 U.S.C. § 1270(a).

17. SMCRA also provides a private cause of action and waives the United States' sovereign immunity. *See id.*

18. To the extent SMCRA does not grant judicial review, the APA, 5 U.S.C. §§ 701-706, provides a cause of action and waives sovereign immunity.

19. The statute commonly known as the Declaratory Judgment Act, Act of June 14, 1934, Pub. L. No. 73-343, 48 Stat. 955 (1934) (codified at 28 U.S.C. §§ 2201-02), grants this Court authority to issue declaratory judgment.

20. Moreover, 28 U.S.C. § 1361 grants this Court authority to issue a writ of mandamus.

21. Because the King II Mine mining happens within the geographic borders of Colorado, SMCRA's citizen-suit provision designates this judicial district as the "only" venue for this action. 30 U.S.C. § 1270(c)(1); *see* 28 U.S.C. § 85.

## PLAINTIFFS

22. Citizens for Constitutional Integrity is a nonprofit organization that develops and advocates for legislation, regulations, and government programs. They are citizens holding governments accountable to their constitutions. Under the rule of law, everything the government does qualifies as legal or illegal. Citizens for Constitutional Integrity watches for actions that contravene our bedrock, fundamental principles, circumstances, and motivations that drove the Founding Fathers and the people in drafting and adopting the Constitution.

23. Southwest Advocates, Inc., (once-named SW CO Advocates, Inc.), is a Colorado nonprofit corporation that aims to stop the degradation, and to improve, the environmental integrity, health, water quality, water quantity, air quality and other benefits of the impacted high desert ecosystems of the Four Corners Area for humans, plants, and animals who may live in, or who may return to a healthier ecosystem. Southwest Advocates' members live in and around the King II Mine. For years in hearings at the La Plata County Commission (the County), Southwest Advocates consistently expressed concerns and sought to save their neighborhood, their water, and their ecosystem. They produced voluminous expert reports on the impacts of the King II Mine on the local community.

24. The stark and serene, high-desert beauty drew many Southwest Advocates members to this area. They adore the sage brush, and piñon-juniper gulches, and they feel joy at living with their neighbors that include bobcats, bears, mountain lions, coyotes, jack rabbits, harrier hawks, kestrels, peregrine falcons, and golden eagles. Some members' well water comes from a coal seam. They use that water for laundry and bathing; and they plan to use it for horses to drink.

25. Other Southwest Advocates members appreciate the La Plata drainage as part of the "thin green line" of species-rich riparian systems, which snake through the Western arid landscapes, and are continually threatened by

water projects and development. They love the open spaces, natural water systems, and piñon-juniper woodland adjacent to the La Plata drainage. They love seeing the wildlife, such as deer and bobcats, great-horned owls, and willow flycatchers.

26. The La Plata River runs through the area. Already, climate change threatens its flow, and the Mine is taking even more water from the river and from the groundwater aquifers underlying the area. Less water will support fewer animals and fewer trees and shrubs. Already, some trees that once thrived have died. Not only does the Mine take water out of the ecosystem; burning the coal also exacerbates the climate change that is drying up the area. Citizens for Constitutional Integrity and Southwest Advocates (collectively, Citizens) seek to protect the area from this expanding coal mine that threatens their well water, their river water, and their way of life.

## DEFENDANTS

27. The United States owes its citizens a duty to comply with the Constitution.

28. David Bernhardt serves as Secretary of the Department of the Interior. Mr. Bernhardt oversees and directs the Department of the Interior's (Interior) activities.

29. Lanny Erdos serves as Acting Director of OSMRE. Mr. Erdos oversees and directs OSMRE's activities.

30. Casey Hammond serves as Acting Assistant Secretary for Land and Minerals Management. He exercises delegated authority on behalf of the Secretary that includes overseeing and directing OSMRE's activities.

## LEGAL BACKGROUND

### I. The Mineral Leasing Act

31. The act commonly known as the Mineral Leasing Act of 1920 (the Mineral Act), Pub. L. No. 66-146, 41 Stat. 437 (Feb. 25, 1920), authorizes the Secretary to lease coal deposits that the United States owns.  Although the Bureau of Land Management (BLM), a component within Interior, generally leases federal coal rights, the Mineral Act assigns the Secretary responsibility to approve a Mining Plan that leases those rights only in the "public interest" and according to the "terms and conditions" the Secretary requires. 30 U.S.C. §§ 201(a)(1), 207(a), 207(c).

### II. The Surface Mining Control Act

32. OSMRE had issued the Stream Protection Rule under the Surface Mining Control and Reclamation Act (SMCRA). Through SMCRA, Congress intended to "[en]sure that surface coal mining operations are so conducted as to protect the environment"; it "exercise[d] the full reach of Federal constitutional powers to [e]nsure the protection of the public interest through effective control of surface coal mining operations." *Id.* § 1202(d), (m).

33. Congress enacted SMCRA in 1977 because it found "many surface mining operations" will "destroy[] or diminish[] the utility of land," cause "erosion and landslides," pollute water, destroy fish and wildlife habitats, impair natural beauty, and degrade "the quality of life in local communities." *Id.* § 1201(c). Congress sought to "minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." *Id.* § 1201(d).

34. To prevent and to remedy these problems, Congress created "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." *Id.* § 1202(a). It established a "cooperative federalism" program for coal mining and empowered OSMRE to promulgate regulations. *Id.* § 1211(c)(2); *Hodel v. Va. Surface Mining Reclamation Ass'n*, 452 U.S. 264, 289 (1981). States generally take primary jurisdiction to regulate coal mining for "their own particular needs." *Hodel*, 452 U.S. at 289.

35. In some situations, however, the United States retains control over surface mining. SMCRA regulations make the Secretary "responsible" for approving or disapproving mining plans on "lands containing leased Federal coal . . . . in accordance with the Mineral Leasing Act . . . ." *Id.* § 740.4(a), (a)(1). On "Indian lands," Congress also retained federal control. 30 U.S.C. §§ 1253, 1300; 30 C.F.R. § 750.6(a).

36. To regulate surface coal mining, SMCRA uses two "basic mechanisms: a permit system and a series of performance standards." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 699 (D.C. Cir. 1988) (citations omitted). Before issuing a coal mining permit, SMCRA requires mining companies to "submit detailed information concerning the environmental consequences of the proposed mining operations and include a plan for reclaiming affected lands as required by the Act." *Id.*; 30 U.S.C. §§ 1256(a), 1266(b). And after mining begins, SMCRA requires mining companies to "adhere to the statutory environmental performance standards, many of which relate to the obligation to restore and reclaim affected lands." *Nat'l Wildlife Fed'n*, 839 F.2d at 699.

37. As one of the most important parts of the permitting process, SMCRA requires mining companies to assess "the probable cumulative impact of all anticipated mining in the area on the hydrologic balance" and "to prevent material damage" to that balance—not only inside but also outside the permit area. 30 U.S.C. § 1260(b)(3). Specifically, SMCRA requires mining companies to "protect offsite areas from damages which may result from [underground] mining operations" *Id.* § 1266(b)(7).

38. SMCRA regulations require a mining plan to comply with federal laws, regulations, and executive orders. *See* 30 C.F.R. § 746.13. Without a mining plan, no one can mine any federal coal they lease. *Id.* § 746.11(a). The mining plan, in turn, "bind[s]" the miners. *Id.* § 746.17(b). When OSMRE exercises

jurisdiction to approve a mining plan, it sends "a decision document recommending to the Secretary approval, disapproval or conditional approval of mining plans and of modifications thereto." *Id.* § 740.4(b)(1).

### III. The Congressional Review Act

39. Congress passed the Congressional Review Act as a new, easier method for overturning Executive Branch decisions.[5] Passed in 1996, Congress intended it to implement a legislative veto to replace the one the Supreme Court struck down in 1983. *See* 141 CONG. REC. H 5099 (May 17, 1995) (statement of Rep. Gekas); *Chadha*, 462 U.S. 919. The Review Act both (a) describes the effect of future statutes passed under it and (b) creates a process for passing those future statutes.

40. If Congress and the President pass a statute that invokes specific words for a rule, the Review Act directs courts to interpret that statute to repeal whatever statutory authority the agency could have relied on to issue that rule. *See* 5 U.S.C. §§ 801(b)(1). The Review Act specifies these words: "That Congress disapproves the rule submitted by the _____ relating to _____ and such rule shall have no force or effect." *Id.* § 802(a). When Congress revokes statutory authority for an agency rule this way, the Review

---

[5] *See* H. Rep. 104-874 at 67 (1996), congress.gov/104/crpt/hrpt874/CRPT-104hrpt874.pdf.

Act prohibits the agency from issuing any future rule that is "substantially the same." *Id.* § 801(b)(2).

41. The Review Act's procedures allow Congress to pass statutes with simple majorities in both houses and thereby to evade the Senate's sixty-vote Cloture Rule to end a filibuster.

42. To close debate on most bills and thereby to allow the Senate to vote, the Senate's Cloture Rule requires sixty votes on a cloture motion. Since the Senate changed its rules in 1975, filibusters have not worked like the talking filibuster in MR. SMITH GOES TO WASHINGTON.[6] As the Congressional Research Service recognizes, "[t]hreatened filibusters on motions to proceed once were rare but have become more common in recent years."[7] As threatened filibusters increased, so did the number of cloture votes.[8]

43. Today, no legislation passes the Senate when forty-one senators do not consent. Congress's own specialists acknowledge that bills subject to filibusters do not pass the Senate without sixty votes to invoke cloture: "when the requisite support cannot be assembled to invoke cloture . . ., the measure

---

[6] VALERIE HEITSHUSEN & RICHARD S. BETH, CONG. RESEARCH SERV., FILIBUSTERS AND CLOTURE IN THE SENATE ii (Apr. 7, 2017), crsreports.congress.gov/product/pdf/RL/RL30360; MR. SMITH GOES TO WASHINGTON (Columbia Pictures 1939).
[7] FILIBUSTERS AND CLOTURE IN THE SENATE 10.
[8] U.S. Senate, Cloture Motions, https://www.senate.gov/legislative/cloture/clotureCounts.htm.

. . . that is being filibustered will not receive chamber approval . . . ." FILIBUSTERS AND CLOTURE IN THE SENATE 18. That effectively creates a sixty-vote threshold. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) (recognizing "the Senate's normal 60-vote filibuster requirement").

44. The Review Act replaces the sixty-vote threshold in the Senate with a simple-majority-vote threshold for passing a very narrow set of statutes. 5 U.S.C. § 802(g)(1).

## IV. The Administrative Procedure Act

45. The Administrative Procedure Act creates a three-step procedure for "notice-and-comment rulemaking." 5 U.S.C. § 553; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). First, the agency publishes a notice of proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). Second, it gives interested persons an opportunity to comment, and courts require responses to significant comments. *Id.* § 553(c). Third, the agency promulgates the final rule by publishing it in the Federal Register with "a concise general statement of [its] basis and purpose." *Id.* § 553(c). These "legislative rules" issued through this notice-and-comment process have the "force and effect of law." *Perez*, 575 U.S. at 96 (quotations omitted).

46. The APA also creates a system of judicial review. 5 U.S.C. §§ 701-706. Courts routinely apply "APA standards to rulemaking actions undertaken pursuant to SMCRA." *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473

16

F.3d 94, 101 n.5 (4th Cir. 2006). The APA assigns courts to review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *Ohio River Valley*, 473 F.3d at 100.

47. Under administrative law, the APA requires courts to undertake a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), overruled on other grounds by *Califano*, 430 U.S. at 107. Upon that review, the APA directs the Court to "hold unlawful and set aside agency action, findings, and conclusions" that qualify as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B).

## FACTUAL BACKGROUND

### I. The King II Mine expanded and caused more intense impacts as Southwest Advocates fought those impacts.

48. The King Coal Mine (King I Mine) started southwest of Hesperus, Colorado, in 1938 as a small, mom-and-pop mine. *See* Modification Envtl. Assessment (Mod. EA) 13, Ex. 2. Since buying the business in 2005, GCC has expanded this once-small mine into a major coal-producing enterprise. Mod. EA 13.

49. In 2001, National King Coal, LLC, employed thirty-three people. Nat'l King Coal, LLC, Coal Lease Application, East Alkali Tract, COC 62920,

Envtl. Assessment 4 (June 18, 2001) (King II EA), Ex. 3. It produced up to 300,000 tons per year, and every day, eighteen to twenty-eight coal trucks, each weighing thirty tons, traveled County Road 120. *Id.* at 15.

50. In 2007, GCC expanded operations to the King II Mine: 1,224 acres southwest of King I and across County Road 120. King II EA 5; Finding of No Significant Impact (FONSI) for King II (Feb. 22, 2007), Ex. 4. The BLM and OSMRE expected the company had enough coal to mine there until 2026, but the company finished by 2009. King II EA 16; Mod. EA 13. That shortened time frame resulted from GCC mining more coal faster.

51. In 2000, King I produced approximately 160,000 tons of coal. King II EA 4. By 2014, the company's was mining *six times as much* coal: 970,790 tons per year. Mod. EA 15 (160,000 / 970,790 = 6.0). By 2022, it may produce *seven times as much coal*: 1,067,040 tons. Mod. EA 37.

52. Now, GCC plans on expanding not only with the 950.55-acre Modification, but also with a 2,462-acre Dunn Ranch lease. Mod. EA 14; Dunn Ranch Area Lease-By-Application and Mine Plan Modification Envtl. Assessment (Dunn Ranch EA) 1-1, Ex. 5. In contrast to the 18-28 trucks driving on County Road 120 in 2001, GCC anticipates 120 trucks hauling coal, "around the clock" to their cement plants—either directly or by train via the Gallup, New Mexico, BNSF Railway Co. terminal. King II EA 15; Mod. EA 15, 37-38; La Plata Cnty. Bd. of Cnty. Comm'rs, Dep't Report 5 (May 31,

2016), Ex. 6. Between the Modification and the Dunn Ranch Lease, GCC

intends to continue operating the King II Mine until 2043. Dunn Ranch EA 1-

3.

53. Southwest Advocates has been fighting the Mine expansion's impacts

on the local community for years—in front of the La Plata County

Commission, the Colorado Department of Mining Safety and Enforcement,

and OSMRE.

54. In 2006, the La Plata County Commission did not realize its

ordinances required GCC to obtain a local land-use permit for the King II

Mine. Dep't Report 3. By 2010, however, the County realized it could require

a permit. *Id.* It informed GCC that it would require GCC to obtain a land-use

permit. *Id.* GCC had no incentive to comply promptly because it was already

removing coal out of the ground. GCC took two years even to apply for a haul-

truck permit on County Road 120. *Id.*

55. Then, the County took six more years to issue GCC the permit—ten

years after the local ordinances would have required the permit. *See* La Plata

Cnty. Special Planning Meeting Mins. 24 (June 1, 2016), Ex. 7. GCC

continued mining coal during that lengthy delay. Instead of facilitating the

process, GCC bullied the neighbors, drug its feet, and resisted every

mitigation measure. Again, because GCC continued mining, the County had

little leverage.

56. Southwest Advocates members watched this Mine change their homes and their ways of living. Ultimately, they managed to extract from GCC a few conditions, which did little to mitigate the impacts.

57. The County held seven public hearings: two in 2014, one in 2015, and four in 2016. Dep't Report 3-4. Until the last, the County postponed any decision "due to significant public comment," or because GCC presented "new information that had not been reviewed by the County or the public," or to allow GCC to negotiate with neighborhood groups. *Id.*

58. In the meantime, Southwest Advocates and likeminded citizens filed with the County voluminous comments and expert reports on the various Mine impacts. *See id.* at 32-34 (listing public comment letters), 47-49 (listing 18 reports). The reports analyzed air quality, noise and vibration, traffic, and water quality. *Id.* at 46.

59. Southwest Advocates commissioned a report that explained the risks of Mine pollutants connecting through the area's complex geologic structures to domestic wells and to the La Plata River. Letter from Randolph Fischer, P.E., to Cynthia Roebuck, Executive Director for Sw. Advocates (Dec. 19, 2015), Ex. 8. It found the Mine's "potential water quality impacts may result in possible human health and environmental consequences." *Id*. at 1. Pollutants from the Mine could migrate down the "natural downgradient . . . in the Hay Gulch alluvial aquifer system," and could "affect the quality of

water . . . domestic and agricultural wells." *Id.* Pollutants could also contaminate domestic wells through "interconnections between the geologic formations in which mining is occurring or is planned to occur." *Id.* at 2. The Mine's pollutants could drain into the La Plata River and impact the local "surface water quality and . . . aquatic ecosystem." *Id.* at 1.

60. Moreover, the mining could cause subsidence fractures, which could drain or disrupt surface waters, groundwater, and confined bedrock aquifers above mined-out areas. *Id.* In other words, the mining subsidence could create cracks and leaks that could dewater the perched aquifers from which residents draw their wells. *See id.* Thus, even if the Mine is removing coal from below domestic wells, the settling ground could cause wells to go dry. *See id.*

61. Based in large part on Southwest Advocates' efforts and voluminous public comments, the County required GCC to abide by twenty-eight conditions on the land-use permit. La Plata Cnty. Special Planning Meeting Mins. 24-33. Because the County permit focused on the road safety and traffic impacts, so did the County's conditions.

62. The County required some slight mitigation measures that did not impact water quality:

- Flashing warning signs,
- Speed limits for coal-hauling trucks,

- Radar signs that displayed drivers' speed,

- Manual radar speed-checks of coal-hauling trucks,

- Publishing the trucks' speeds,

- Sundays without truck traffic,

- Noise mitigation,

- Noise buffering on two parcels, and

- Road maintenance fees.

*Id.*

63. The County required GCC to survey and to mitigate weeds, to secure the water rights it was pursuing, to provide parking and an expanded septic system for its workforce. *Id.* Although two conditions relate to water-quality, they have no teeth. The two conditions just require GCC to complete monitoring it was already pursuing and to post the monitoring results on a website. *Id.* at 27, 30-31.

64. Despite Southwest Advocates' years of work, volunteer efforts, members' attendance at meetings, letters, and comments, GCC did little to ensure its mining pollution would not impact local residents' wells. It did nothing to ensure that the La Plata River maintained the flow from before the drastic Mine expansion.

## II. The Stream Protection Rule resulted from over twelve years of analysis.

65. While La Plata County was taking its time in requiring GCC to complete these minimal mitigation measures, and ultimately doing little to secure local residents' water supply, OSMRE was completing a thirteen-year effort that culminated in the Stream Protection Rule. That saga begins with a relatively modest, 2004 proposal related to mine waste and streams. In 2016, OSMRE issued a final rule that overhauled the entire SMCRA regulatory regime. In 2017, Congress unconstitutionally rescinded statutory authority for that rule.

66. In 2004, OSMRE proposed the Excess Spoil; Stream Buffer Zones; Diversions Rule, 69 Fed. Reg. 1,036 (Jan. 7, 2004). There, the agency sought to reconsider and to minimize effects on streams from mining companies depositing waste materials next to streams. *Id.*; *see* 30 C.F.R. § 710.5 (defining spoil and overburden). Instead of issuing a final rule, however, OSMRE concluded that it could better assess alternatives in an environmental analysis. Notice of Intent to Prepare an Envtl. Impact Statement, 70 Fed. Reg. 35,112 (June 16, 2005).

67. Three years later, OSMRE issued an expanded new rule that amended the SMCRA regulations related to streams coal-mine waste material. Excess

Spoil, Coal Mine Waste, and Buffers for Waters of the U.S., 73 Fed. Reg. 75,814 (Dec. 12, 2008).

68. Ten environmental groups immediately challenged that 2008 rule in two lawsuits. After six years of litigation, OSMRE confessed legal error for violating the Endangered Species Act, 16 U.S.C. §§ 1531-1544. *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 11 (D.D.C. 2014).

69. On remand, OSMRE again expanded the scope of the regulations to propose the Stream Protection Rule. 80 Fed. Reg. 44,436 (July 27, 2015). This time, OSMRE proposed revising its regulations, based on "advances in science" and other new information, "to improve the balance between environmental protection and the Nation's need for coal as a source of energy." *Id.* Members of the public and government agencies sent 94,000 written or electronic comments. 81 Fed. Reg. at 93,070.

70. Over the next year, OSMRE considered the comments and incorporated responses into the final rule. At over 380 Federal Register pages, the Stream Protection Rule fundamentally changed the SMCRA regulations. *Id.*

71. OSMRE identified voluminous benefits from the Stream Protection Rule. From 2020 to 2040, OSMRE predicted that the rule would

- restore 462 miles intermittent and perennial streams,

- improve water quality in 5,523 miles of intermittent and perennial streams downstream of mine sites,

- protect 84 miles of intermittent and perennial streams from excess spoil fills or coal mine waste facilities, and

- improve reforestation on 51,828 acres of mined land.

81 Fed. Reg. at 93,069 (22 miles, 263 miles, 4 miles, and 2,486 acres, respectively, each year multiplied by 21 years).

72. The Stream Protection Rule would create 280 jobs. *Id.* It will reduce greenhouse gas emissions by 2.6 million short tons in one year, which OSMRE projects would benefit the United States by $57 million each year in reduced carbon dioxide emissions. *Id.*

73. OSMRE concluded that the Stream Protection Rule would "better protect the water resources needed by current and future generations for drinking, recreation, and wildlife from the adverse effects of coal mining." *Id.* at 93,073. It concluded that, "[e]ven if [lower impacts on water resources] were the only benefits of the rule, and they are not, the benefits to water resources alone are sufficient to support and justify a nationwide rulemaking." *Id.*

## III. Congress used the Review-Act, legislative shortcut to withdraw OSMRE's authority for the Stream Protection Rule.

74. OSMRE issued the Stream Protection Rule in December 2016. In January 2017, the House approved House Joint Resolution 38. Pub. L. No. 115-5, 131 Stat. 10 (Feb. 16, 2017), congress.gov/115/plaws/publ5/PLAW-

115publ5.pdf. The Senate approved it the next day, and the President signed it the next month. *Id.* Later in 2017, OSMRE withdrew the Stream Protection Rule from the Federal Register. Congressional Nullification of the Stream Protection Rule Under the Congressional Review Act, 82 Fed. Reg. 54,924 (Nov. 17, 2017).

**IV. The King II Mine Expanded Two More Times since 2017.**

75. With the Stream Protection Rule out of the way, GCC sought to expand the King II Mine immediately.

76. In March 2017, GCC submitted to OSMRE a permit application package to revise Federal Permit CO-0106A to mine 950.55 additional acres at the King II Mine. Mod. EA 12.

77. Ten months later, in January 2018, GCC submitted to OSMRE a Lease by Application package for the Dunn Ranch lease, which would allow GCC to mine 2,462 acres adjacent and northwest of the King II Mine. Dunn Ranch EA 1-1.

78. OSMRE did not analyze either the Mine Approval to determine whether it complied with the Stream Protection Rule. The analyses in the Mine Approval violate the rule in several ways.

79. First, OSMRE failed to apply the fundamentally overhauled Stream Protection Rule to the Mine, and that undermines every conclusion it reached.

26

80. Second, OSMRE failed to protect the La Plata River from drying up more than necessary by failing to apply the Stream Protection Rule's new definition of material damage to the hydrologic balance.

81. Third, OSMRE failed to consider the impacts, on the hydrologic balance, from lost groundwater diverted from the La Plata River to the Mine, instead of the Huntington farm.

82. Fourth, OSMRE failed to implement the robust monitoring procedures that the Stream Protection Rule requires to ensure mines do not pollute the nearby wells and groundwater.

83. OSMRE committed these failures despite a complex underlying geology. GCC's own expert admitted that "[t]he environ[ment] encompassing the King I and King II Mines is a microcosm of complexity." County Report 565. It recognized that "[l]ow [total dissolved solids in the] water from the La Plata River, via the Hay Gulch Ditch can mix with regional rainwater and existing shallow aquafers [sic] to produce mixed and ever changing water sources." *Id.* Moreover, it found, "[t]he complex nature of the interaction of various water sources within the Hay Gulch environ precludes straightforward interpretations of the presented data." *Id.*

84. Hay Gulch Ditch, Inc., owns the water rights in the Hay Gulch Irrigation Ditch, and it diverts water from the La Plata River south of Highway 160 through Hay Gulch, itself. *See In re GCC Energy, LLC*, No.

2015CW3029, ¶¶ 6.1.2, 6.1.7  (D. Ct. Water Div. Jan. 6, 2017), Ex. 9. Some

water returns to the La Plata River south of the Mormon Reservoir. *Id.* at 4;

Dunn Ranch EA 3-13.



**FIGURE 4-1**

**Surface Water Features**

85. OSMRE never rebutted a 1985 report by the U.S. Geological Survey that found that mining in Hay Gulch had already polluted the aquifers and degraded the water quality there:

> Mining of coal in the Menefee Formation in the Hay Gulch study area has resulted in the degradation of water quality in the alluvial aquifer. Contamination from past and present mining has affected water quality in the alluvium in upper Hay Gulch . . . .

TOM BROOKS, U.S. GEOLOGICAL SURVEY, HYDROLOGY OF COAL-LEASE AREAS NEAR DURANGO, COLORADO 34, Ex. 10. The U.S. Geological Survey found that "[e]ffects from coal mining may extend to distant drainages. Additional data collection would provide a more complete framework for assessing the hydrologic effects of mining." *Id.* Therefore, even as OSMRE failed to comply with its legal obligations, it also ignored unfavorable information on this massive coal mine expansion.

A. <u>OSMRE applied the wrong standard of review by failing to apply new definitions of "hydrologic balance" and "material damage."</u>

86. OSMRE's failure to apply the Stream Protection Rule fatally undermined its SMCRA analysis because it consequently applied the wrong definitions for determining impacts.

87. Among its most important directives, SMCRA requires mine operators to prevent "material damage to the hydrologic balance outside the permit area." 30 U.S.C. § 1260(b)(3). The Stream Protection Rule redefines the standard "hydrologic balance" to account for "interactions that result in

changes in the chemical composition or physical characteristics of groundwater and surface water."[9] It changed the definition of "[m]aterial damage to the hydrologic balance outside the permit area" to require "each permit [to] establish the point at which adverse mining-related impacts on groundwater and surface water reach an unacceptable level . . . ."[10] OSMRE never applied this new definition.

B. OSMRE failed to prevent material damage to the hydrologic balance near the La Plata River.

88. Applying the wrong law led to lower flows in the La Plata River. The Stream Protection Rule requires OSMRE to decide whether the "proposed operation has been designed to prevent material damage to the hydrologic balance outside the permit area." *Id.* It requires permitees to identify the premining baseline to ensure that "perennial streams located outside the permit area will retain perennial flows . . . during and after mining and reclamation." 30 C.F.R. § 780.21(b)(9)(iii), 81 Fed. Reg. at 93,341.

89. If OSMRE had completed the analysis the rule required, it would have realized that the Mine was taking so much water from the La Plata River that it risked the river running dry more often. The Colorado Water Court

---

[9] *Compare* 30 C.F.R. § 701.5 *with* Stream Protection Rule, 30 C.F.R. § 701.5, 81 Fed. Reg. 93,321.
[10] *Compare* 30 C.F.R. § 701.5 *with* Stream Protection Rule, 30 C.F.R. § 701.5, 81 Fed. Reg. at 93,068, 93,322.

calculated the volume of water the Mine could buy from the Huntington farm "not based on *historic* monthly CCU, but rather [on] the *actual daily* [*volume*] *available* for the [Huntington farm's] 44 Acres based on water availability . . . ." *In re GCC Energy, LLC*, No. 2015CW3029, ¶ 6.1.8(e) (D. Ct. Water Div. Jan. 6, 2017) (emphasis added); *In re GCC Energy, LLC*, No. 07CW100, ¶ 6.8.4 (D. Ct. Water Div. Apr. 20, 2011) (same for nine acres), Ex. 11. This subtle switch led to lower flows in the La Plata River.

90. OSMRE issued the Stream Protection Rule to protect rivers like the La Plata. It has failed to protect the La Plata.

### C. OSMRE failed to consider groundwater losses from diverting water from 56 acres of dried-up land.

91. In the Modification EA and again in the Dunn Ranch EA, OSMRE failed to analyze losses to the ground water from diverting Hay Gulch Ditch water from the Huntington farm to the Mine. It never accounted for irrigation water that historically infiltrated through Huntington's irrigated land to recharge the groundwater. *See* Harris Water Eng'g, Inc., *GCC Energy Mine, Substitute Water Supply Plan* 3-6 (Oct. 8, 2015), Ex. 12. OSMRE failed to assess the "probable cumulative impacts of all anticipated coal mining on the hydrologic balance in the cumulative impact area," and that violated the rule, 30 C.F.R. § 773.15(e).

92. The Stream Protection Rule requires OSMRE to analyze a mine approval's impacts on "[t]he availability of groundwater and surface water, including the impact of any diversion of surface or subsurface flows to underground mine workings . . . ." 30 C.F.R. § 784.20(a)(5)(v), 81 Fed. Reg. at 93,340. When the Huntington farm used its water to irrigate crops, some water would have infiltrated into groundwater and never returned to Hay Gulch Ditch, but the Water Court and the Modification EA never accounted for those groundwater losses. *See In re GCC Energy, LLC*, No. 2015CW3029, ¶ 6.1.8(e); *In re GCC Energy, LLC*, No. 07CW100, ¶ 6.8.6 (D. Ct. Water Div. Apr. 20, 2011); *Substitute Water Supply Plan* 4. Failing to account for that lost groundwater violated the Stream Protection Rule, 30 C.F.R. § 784.20(a)(5)(v).

D. OSMRE failed to monitor the groundwater for all contaminants the Stream Protection Rule required.

93. OSMRE failed to require GCC to monitor for enough contaminants. The Stream Protection Rule lists the contaminants it requires mines to monitor, but the Mine did not monitor for all of them.[11]

---

[11] *Compare* Stream Protection Rule, 30 C.F.R. § 780.19(a)(2), 780.19(b)(6)(ii)(D), 85 Fed. Reg. at 93,336-37, *with* Mod. EA C-1, Table 2.

| Pollutant | Stream Protection Rule Required | King II Completed |
|---|---|---|
| Bicarbonate | Yes | Yes |
| Calcium | Yes | Yes |
| Conductivity | Yes | Yes |
| Iron | Yes | Yes |
| Magnesium | Yes | Yes |
| Manganese | Yes | Yes |
| pH | Yes | Yes |
| Sodium | Yes | Yes |
| Sulfate | Yes | Yes |
| Temperature | Yes | Yes |
| Total dissolved solids | Yes | Yes |
| Any cation or anion that constitutes a significant percentage of the total ionic charge balance, but that was not included in the analyses of major anions and major cations | Yes | No |
| Cation-anion balance of dissolved major cations and dissolved major anions | Yes | No |
| Chloride | Yes | No |
| Hot acidity | Yes | No |
| Potassium | Yes | No |
| Selenium (dissolved) | Yes | No |
| Total alkalinity | Yes | No |

94. Separately, the Stream Protection Rule required GCC to provide "the Palmer Drought Severity Index for the proposed permit and adjacent areas for the initial baseline data collection period . . . ." Stream Protection Rule, 30 C.F.R. § 780.19(b)(6)(iii), 81 Fed. Reg. at 93,362. Consequently, the Mine has no baseline against which to compare the monitoring now. SMCRA, the Stream Protection Rule, and the APA require OSMRE to stop the mining immediately, to monitor for all of the pollutants to develop the baseline, to

consider the Palmer Drought Severity Index, and to reevaluate whether to approve the Mine.

95. As 30 U.S.C. § 1270, and 30 C.F.R. § 700.13, require, Citizens and Southwest Advocates sent a letter to OSMRE, GCC, and others on October 14, 2020, to provide sixty days of notice before filing this lawsuit. Ex. 13.

## COUNT 1

96. Citizens hereby adopts by reference the previous paragraphs.

97. On their faces, the Congressional Review Act and the Cloture Rule, together, violate the equal protection in the Fifth Amendment by protecting citizens differently depending on the type of statute that protects them.

98. They treat differently (a) citizens protected by statutes that delegate authorities to agencies and (b) citizens protected by other statutes. The Review Act therefore takes away equal protection of the laws from Southwest Advocates and other citizens.

99. The Stream Protection Rule protected the waters of the United States. By unconstitutionally depriving Southwest Advocates and other citizens of equal protection under the law, the Review Act and the Cloture Rule violate the equal protection guarantee in the Fifth Amendment. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017) (applying equal protection principles from the Fourteenth Amendment to the United States under the Fifth Amendment).

100. As a consequence of applying an unconstitutional law, OSMRE failed to apply the Stream Protection Rule to the Mine Approval, and therefore violated SMCRA. Because OSMRE applied the wrong law, SMCRA and the APA require the Court to hold the Mine Approval unlawful. *See NLRB v. Brown*, 380 U.S. 278, 292 (1965) ("Courts must, of course, set aside [agency] decisions which rest on an erroneous legal foundation.") (quotations omitted); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("if the action is based upon a determination of law . . ., an order may not stand if the agency has misconceived the law.").

## COUNT 2

101. Citizens hereby adopts by reference the previous paragraphs.

102. On its face, the Congressional Review Act violates substantive due process in the Fifth Amendment because the Review Act fails the rational basis test.

103. Without evidence of agency bad faith or any reasonably calculated possibility that a lower voting threshold would cure that bad faith, no rational basis exists for reducing the voting threshold for withdrawing statutory delegations to agencies.

104. Moreover, changing the Constitutional thresholds for passing laws does not qualify as a legitimate government objective.

105. As a consequence of applying an unconstitutional law, OSMRE failed to apply the Stream Protection Rule to the Mine Approval and therefore violated SMCRA. Because OSMRE applied the wrong law, SMCRA and the APA require the Court to hold the Mine Approval unlawful. See *NLRB*, 380 U.S. at 292; *Chenery Corp.*, 318 U.S. at 94.

## COUNT 3

106. Citizens hereby adopts by reference the previous paragraphs.

107. On their faces, the Review Act and the Cloture Rule, together, violate separation of powers.

108. They create a one-way ratchet that, over time, erodes and undermines the Executive Branch's authority. The Executive Branch obtains powers only from two sources: directly from the Constitution, and from Congress delegating statutory authority to accomplish particular ends.

109. The Review Act, over time, reduces the statutory delegations of authority by making it easier to rescind statutory delegations, but the Cloture Rule makes it harder to expand those same statutory delegations.

110. The separation of powers prohibits Congress from creating legislative structures that erode or undermine another branch. The Review Act and the Cloture Rule, together, violate the separation of powers principles in the Constitution by hobbling the Executive Branch.

111. As a consequence of applying an unconstitutional law, OSMRE failed to apply the Stream Protection Rule to the Mine Approval and therefore violated SMCRA. Because OSMRE applied the wrong law, SMCRA and the APA require the Court to hold the Mine Approval unlawful. See *NLRB*, 380 U.S. at 292; *Chenery Corp.*, 318 U.S. at 94.

## PRAYER FOR RELIEF

112. Citizens requests the following relief:

a. Declare unconstitutional and void the two-tier structure for passing bills, under the Congressional Review Act and the Cloture Rule.

b. Declare the Stream Protection Rule, 81 Fed. Reg. 93,066 (Dec. 20, 2016), valid and enforceable against the United States and the respective defendants.

c. Vacate and set aside the King II Mine Modification Approval.

d. Remand the King II Mine Modification Approval for reconsideration consistent with the Stream Protection Rule.

e. Enjoin all mining activities under the King II Mine Modification Approval until the Agencies comply with the Constitution, SMCRA, the Stream Protection Rule, and the APA.

f. Issue temporary relief that stops the Mine under 30 U.S.C. § 1276(c) until the Court rules on a final remedy.

g. Award attorney fees and costs in favor of Citizens for Constitutional Integrity and Southwest Advocates, Inc.

h. Any other and further relief as the Court concludes necessary or appropriate.

Dated December 15, 2020,

         */s/ Jared S. Pettinato*          
JARED S. PETTINATO, DC Bar No. 496901
The Pettinato Firm
3416 13th St. NW, #1
Washington, DC 20010
(406) 314-3247
Jared@JaredPettinato.com

Attorney for Plaintiffs