**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

**Civil Action No. 1:21-cv-923-RM-STV,** *consolidated with* **No. 20-cv-3668-RM-STV**

**CITIZENS FOR CONSTITUTIONAL INTEGRITY; and
SOUTHWEST ADVOCATES, INC.,**

**Plaintiffs,**

**v.**

**THE OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT;
DEB HAALAND, Department of the Interior Secretary, in her official capacity;
GLENDA OWENS, Exercising the Authority of the Director of the Office of Surface
Mining Reclamation and Enforcement, in her official capacity;
LAURA DANIEL DAVIS, Senior Adviser to the Secretary, Exercising the Delegated
Authority of the Assistant Secretary for Land and Minerals Management, in her official
capacity; and
THE UNITED STATES OF AMERICA;[1]**

**Defendants.**

---

**AMENDED COMPLAINT AND PETITION FOR REVIEW OF AGENCY ACTION[2]**

---

JARED S. PETTINATO
The Pettinato Firm
3416 13th St. NW, #1
Washington, DC 20010
(406) 314-3247
Jared@JaredPettinato.com
*Attorney for Plaintiffs*

---

[1] For the convenience of the Parties and the Court in referring to the two consolidated cases,
Plaintiffs Citizens for Constitutional Integrity and Southwest Advocates, Inc., have reordered
Defendants in the caption.
[2] Citizens are filing this amended complaint as a matter of right under Federal Rule of Civil
Procedure 15(a)(1)(B).

## INTRODUCTION

1. Fifty-one does not equal sixty. If "equal protection" means anything, it means that the Constitution protects citizens from Congress rescinding protections of citizens using unequal voting thresholds. But in the Congressional Review Act[3] and in the Senate's Cloture Rule,[4] commonly known as the filibuster, the Senate set two voting thresholds. Those two thresholds violate equal protection, substantive due process, and the separation of powers.

2. Generally, the Supreme Court approves of Congress delegating legislative authority to agencies, which agencies exercise by issuing legislative rules. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Loving v. United States*, 517 U.S. 748, 758 (1996). Those statutory delegations completely define the agency's authority. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). After it delegates legislative authority, Congress's participation in agency rulemaking ends—unless or until it enacts a new statute to amend that authority. *Bowsher v. Synar*, 478 U.S. 714, 733-734 (1986).

3. In the 1996 Congressional Review Act (the Review Act), Congress created a new process for rescinding its delegations. Congressional Review Act, Contract with America Advancement Act of 1996 § 251, Pub. L. No. 104-121, 110 Stat 847, 868 (codified at 5 U.S.C. §§ 801-808) (Mar. 29, 1996). The Review Act allows Congress, with a short phrase that targets a recent legislative rule, to carve out and to withdraw whatever delegated authority had allowed the agency to issue the target rule. 5 U.S.C. §§ 801(b)(1), 802(a). Congress set a fifty-one-vote threshold in the Senate for rescinding those statutory authorities, which allowed Congress to

---

[3] Section 251 of the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat 847, 868 (codified at 5 U.S.C. §§ 801-808) (Mar. 29, 1996).
[4] Rule 22.2, Standing Rules, Orders, Laws, And Resolutions Affecting the Business of the United States Senate (113th Cong., 1st Sess.), gpo.gov/senatemanual.

avoid the Senate's Cloture Rule, commonly known as the filibuster. The Cloture Rule sets a sixty-vote threshold for passing most other bills—including bills to delegate new authorities.[5]

4. Under that unconstitutional, two-tiered voting threshold, Congress passed one law that undermined environmental protections at the King II Mine (the Mine), a coal mine in southwestern Colorado. By implementing that unconstitutional law, the Office of Surface Mining Reclamation and Enforcement (OSMRE) violated the Constitution and the Stream Protection Rule, 81 Fed. Reg. 93,066 (Dec. 20, 2016), and failed to ensure the Mine would not impact local residents' well water, wildlife, groundwater, and the La Plata River.

5. On December 15, 2020, Citizens for Constitutional Integrity and Southwest Advocates, Inc., (Citizens) filed the first lawsuit challenging one Mine expansion. Compl., *Citizens for Constitutional Integrity v. United States*, No. 20-cv-3668-MSK (D. Colo.) (challenging the "mining plan modification to mine within Federal Coal Lease COC-62920 at the King II Mine"). That Modification Mine Approval expanded the King II Mine by 950.55 acres. *Id.* ¶ 52. This Court consolidated that case with this case. ECF No. 46.[6] It later dismissed that case on August 30. Order, ECF No. 52.

6. In that complaint, Citizens foreshadowed a second Mine expansion, the Dunn Ranch Lease. *Id.* The Dunn Ranch Lease expands the Mine by 2,462 additional acres. *Id.* Just five days before the President Joe Biden Administration took office, on January 15, 2021, the Department of the Interior approved the Dunn Ranch Lease (the Mine Approval). Ex. 1.

---

[5] Rule 22.2, Standing Rules, Orders, Laws, and Resolutions Affecting the Business of the U.S. Senate (113th Cong., 1st Sess.), gpo.gov/senatemanual.
[6] Except where noted as the docket for 1:21-cv-923-RM-STV, this amended complaint will refer to the ECF numbers on the consolidated docket.

7. This new federal coal lease under Ute Mountain Ute land starts with a "low-cover crossing." GCC Energy, LLC, which runs the Mine, will erupt out of the east side of the mountain on East Alkali Gulch, will build three or four large roads over the gulch, and will create a new shaft back into the gulch on the other side. Dunn Ranch Area Lease-By-Application and Mine Plan Modification Environmental Assessment 2-2 to -6 (Dunn Ranch EA), ECF No. 1-7. Then, GCC will cover the three roads with more dirt. *Id.* The Ute Mountain Ute Tribe owns that land, and GCC is not paying the Tribe for that destruction.

8. On the other side of the gulch, GCC can access and extract an even larger coal seam. Without the Dunn Ranch Lease, the Mine will stop work in 2022. *Id.* at 1-3. With it, the Mine will operate through the year 2043. *Id.*

9. Every action during those decades of operation imperils the water supply downgrade from the Mine as miners delve deeper into poorly understood geologic formations. The Mine's owner, GCC Energy, LLC, does not know what happens to fluids that flow out of the Mine, and it does not know how digging the coal will crack the underlying bedrock and geological layers that could impact underground water flows. The Mine extracts coal above-grade of Southwest Advocates' members' wells. GCC is failing to monitor the groundwater sufficiently to ensure pollutants are not mixing with the underground water, which supplies community members' wells. These failures flow from OSMRE's failure to require GCC to comply with the Stream Protection Rule.

10. Moreover, every year the Mine operates, it takes more water from the La Plata River and takes more water that would have replenished underground aquifers. In the striking, dry, high-desert of southwestern Colorado, the Mine takes water to control the coal dust from the La Plata River, one of the few local, perennial streams. It leads the river to run dry nearly every year.

11. Citizens rely on their government agencies to protect them from coal mining pollution and to protect them from coal mines otherwise damaging their ecosystems. Here, the Stream Protection Rule required OSMRE and GCC to complete a more thorough analysis of the groundwater before approving the Modification, and the rule required more monitoring for pollutants after approving the Mine. It also required more analysis of the hydrologic impacts from diverting La Plata River water to the Mine and away from irrigated cropland.

12. Despite the clear danger to this fragile ecosystem, where one drop of pollution spreads farther and lasts longer than in wetter environments, OSMRE approved the Dunn Ranch Lease without complying with the Stream Protection Rule.

13. OSMRE did not follow the Stream Protection Rule because, it contends, Congress rescinded the statutory basis for the rule, so the rule no longer has any effect. [OSMRE] Congressional Nullification of the Stream Protection Rule Under the Congressional Review Act, 82 Fed. Reg. 54,924 (Nov. 17, 2017); Act of Feb. 16, 2017, Pub. L. No. 115-5, 131 Stat. 10. OSMRE, however, is violating the Constitution by failing to recognize Congress's action as void.

14. To rescind the Stream Protection Rule, Congress relied on the Congressional Review Act (the Review Act) and the unconstitutional two-threshold voting in the Senate. *See* 131 Stat. 10. Through enabling statutes, Congress delegates authorities to agencies. The Review Act allows Congress to withdraw those statutory delegations with simple-majority votes in each House and with the President's signature. It facially violates the Constitution in three ways.

15. First, the Review Act and the Cloture Rule, together, violate equal protection. The Review Act allows Congress to rescind delegations to agencies with fifty-one votes, while the Cloture Rule prohibits other legislation from passing the Senate without sixty votes. The Review

Act unequally protects citizens without advancing any important, or even legitimate, government objective.

16. Second, the Review Act violates substantive due process under the Fifth Amendment because it establishes no rational relationship to any legitimate objective.

17. Third, the Review Act and the Senate Cloture Rule, together violate the separation of powers by creating a one-way ratchet for Congress to rescind Executive-Branch authorities more easily than to expand them.

18. Acts contrary to the Constitution are void. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Because Congress used an unconstitutional procedure to withdraw the Stream Protection Rule, the withdrawal is void. 131 Stat. 10. Consequently, the Stream Protection Rule remains in force, and OSMRE violated the Constitution, Surface Mining Control and Reclamation Act of 1977 (SMCRA), Pub. L. No. 95-87, 91 Stat. 445 (codified at 30 U.S.C. §§ 1201-1328), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, by failing to apply it to the Mine Approval.

19. SMCRA and the APA require the Court to vacate and to set aside the Mine Approval until OSMRE complies with the Stream Protection Rule. That will require all work under the Mine Approval to stop.

## CAUSE OF ACTION, JURISDICTION, AND VENUE

20. United States Code Title 28, sections 1331 and 1361, assign this Court jurisdiction over this case both because the case presents a federal question and because it names the United States as a defendant. *See Califano v. Sanders*, 430 U.S. 99, 105 (1977).

21. SMCRA's citizen suit provision grants this Court jurisdiction because Southwest Advocates will be adversely affected by the Secretary of the Interior's and OSMRE's failures to

apply the Stream Protection Rule. *See* 30 U.S.C. § 1270(a); *Haydo v. Amerikohl Mining, Inc.*,
830 F.2d 494, 496 (3d Cir. 1987).

22. SMCRA also provides a private cause of action and waives the United States' sovereign
immunity. *See* 30 U.S.C. § 1270(a).

23. To the extent SMCRA does not grant judicial review, the APA, 5 U.S.C. §§ 701-706,
provides jurisdiction, a cause of action, and a waiver sovereign immunity.

24. The statute commonly known as the Declaratory Judgment Act, Act of June 14, 1934,
Pub. L. No. 73-343, 48 Stat. 955 (1934) (codified at 28 U.S.C. §§ 2201-02), grants this Court
authority to issue declaratory judgment.

25. Separately, 28 U.S.C. § 1361 grants this Court authority to issue a writ of mandamus.

26. The King II Mine mining happens within the geographic borders of Colorado. Therefore,
SMCRA's citizen-suit provision designates this judicial district as the "only" venue for this
action. 30 U.S.C. § 1270(c)(1); *see* 28 U.S.C. § 85.

## PLAINTIFFS

27. Citizens for Constitutional Integrity is a nonprofit organization that develops and
advocates for legislation, regulations, and government programs. They hold governments
accountable. Under the rule of law, everything the government does qualifies as legal or illegal.
Citizens for Constitutional Integrity watches for actions that contravene our bedrock,
fundamental principles, circumstances, and motivations that drove the Framers and the people in
drafting and adopting the Constitution.

28. Southwest Advocates, Inc. (once-named SW CO Advocates, Inc.), is a Colorado
nonprofit corporation that aims to stop the degradation, and to improve, the environmental
integrity, health, water quality, water quantity, air quality and other benefits of the impacted high

desert ecosystems of the Four Corners Area for humans, plants, and animals who may live in, or who may return to a healthier ecosystem. Southwest Advocates' members live in and around the King II Mine. For years in hearings at the La Plata County Commission (the County), Southwest Advocates consistently expressed concerns and sought to save their neighborhood, their water, and their ecosystem. They produced voluminous expert reports on the impacts of the King II Mine on the local community.

29. The stark and serene, high-desert beauty drew many Southwest Advocates members to this area. They adore the sage brush, and piñon-juniper gulches, and they feel joy at living with their neighbors that include bobcats, bears, mountain lions, coyotes, jack rabbits, harrier hawks, kestrels, peregrine falcons, and golden eagles. Some members' well water comes from a coal seam. They use that water for laundry and bathing; and they use it for horses to drink.

30. Other Southwest Advocates members appreciate the La Plata drainage as part of the "thin green line" of species-rich riparian systems, which snake through the Western arid landscapes, and are continually threatened by water projects and development. They love the open spaces, natural water systems, and piñon-juniper woodland adjacent to the La Plata drainage. They love seeing the wildlife, such as deer and bobcats, great-horned owls, and willow flycatchers.

31. The La Plata River runs through the area. Already, climate change threatens its flow, and the Mine is taking even more water from the river and from the groundwater aquifers underlying the area. Less water will support fewer animals and fewer trees and shrubs. Already, some trees that once thrived have died. Not only does the Mine take water out of the ecosystem, but also burning the coal exacerbates the climate change that is drying up the area. Citizens seek to protect the area from this expanding coal mine that threatens their well water, their river water, and their way of life.

## DEFENDANTS

32. The United States owes its citizens a duty to comply with the Constitution.

33. Deb Haaland serves as Secretary of the Department of the Interior. Ms. Haaland oversees and directs the Department of the Interior's (Interior) activities.

34. Glenda Owens is exercising the authority of the Director of OSMRE. Ms. Owens oversees and directs OSMRE's activities.

35. No one is currently serving as Interior Assistant Secretary for Land and Minerals Management. On information and belief, Laura Daniel Davis, Senior Adviser to the Secretary, is exercising the delegated authority of the Assistant Secretary for Land and Minerals Management. That authority includes overseeing and directing OSMRE's activities.

## LEGAL BACKGROUND

### I. The Mineral Leasing Act and the Surface Mining Control Act

36. The act commonly known as the Mineral Leasing Act of 1920 (the Mineral Act), Pub. L. No. 66-146, 41 Stat. 437 (Feb. 25, 1920), authorizes the Secretary of the Interior to lease coal deposits that the United States owns.[7] The Mineral Act assigns the Secretary responsibility to ensure, through "terms and conditions," that mining plans lie in the "public interest" before approving them.[8]

37. Without a mining plan, no one can mine any federal coal they lease. 30 C.F.R. § 746.11(a). The mining plan, in turn, "bind[s]" the miners. *Id.* § 746.17(b). The Secretary's responsibility to approve mining plans extends to Indian lands, even if the United States does not own the underlying coal rights. 30 U.S.C. § 1300; 30 C.F.R. § 750.6(a).

---

[7] *See* 30 U.S.C. §§ 181, 189, 201; *S. Utah Wilderness All. v. OSMRE*, 620 F.3d 1227, 1230 (10th Cir. 2010).

[8] 30 U.S.C. §§ 201(a)(1), 207(a), 207(c); 43 C.F.R. §§ 23.3(c), 23.5, 24.4(d); *see also* 43 C.F.R. §§ 3425.1-8(a) and 3475.1.

38. In 1977, Congress enacted SMCRA because it found "many surface mining operations" will "destroy[] or diminish[] the utility of land," cause "erosion and landslides," pollute water, destroy fish and wildlife habitats, impair natural beauty, and degrade "the quality of life in local communities." 30 U.S.C. § 1201(c). Congress sought to "minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." *Id.* § 1201(d). Therefore, it created "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." *Id.* § 1202(a).

39. SMCRA "establishe[d] a program of cooperative federalism." *Hodel v. Va. Surface Mining Reclamation Ass'n*, 452 U.S. 264, 289 (1981). For mining non-federal coal that does not underlie Indian land, states generally assume primary jurisdiction to regulate coal mining activities to meet "their own particular needs." *Id.*

40. SMCRA regulates coal mining with two "basic mechanisms: a permit system and a series of performance standards." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 699 (D.C. Cir. 1988) (citations omitted). Before a state or OSMRE can issue a coal mining permit, SMCRA requires mining companies to "submit detailed information concerning the environmental consequences of the proposed mining operations and include a plan for reclaiming affected lands . . . ." *Id.*; 30 U.S.C. §§ 1256(a), 1266(b). During mining, SMCRA requires mining companies to "adhere to the statutory environmental performance standards . . . ." *Nat'l Wildlife Fed'n*, 839 F.2d at 699.

41. SMCRA requires mining companies to assess "the probable cumulative impact of all anticipated mining in the area on the hydrologic balance" and "to prevent material damage" to that balance—not only inside but also outside the permit area. 30 U.S.C. § 1260(b)(3). It requires mining companies to "protect offsite areas from damages which may result from [underground] mining operations" *Id.* § 1266(b)(7).

42. As part of SMCRA, Congress created OSMRE and delegated broad authority to implement the new mining law. *Id.* § 1211(c)(2). Despite its duties, OSMRE does not approve operation plans. It sends recommendations to the Assistant Secretary for Lands and Minerals for approval or disapproval. *See* 30 C.F.R. § 740.4(b)(1).

## II. The Administrative Procedure Act

### A.    Rulemaking Process

43. Congress exercises broad authority to delegate legislative rulemaking authority to the agencies. The Constitution requires only an "intelligible principle" to guide the agency. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quotations omitted).

44. After Congress delegates legislative authority by statute, however, the Constitution prohibits any individual in Congress, any single house of Congress, or Congress alone from micro-managing the agency. Congress can further direct an agency only by passing more statutes. *Bowsher*, 478 U.S. at 733-734; *INS v. Chadha*, 462 U.S. 919, 954 (1983).

45. When agencies issue "legislative rules" through the APA's notice-and-comment rulemaking, as OSMRE did with the Stream Protection Rule, those rules have the "force and effect of law." *Perez*, 575 U.S. at 96 (quotations omitted); *see* 5 U.S.C. § 553.

### B.    Judicial Review

46. The APA contains "generous" and "comprehensive provisions" for judicial review, which "allow any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action for which there is no other adequate remedy in a court.'" *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. § 704); *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).

47. The APA provides directions both to agencies and to courts. The APA requires agencies not only to "examine the relevant data," but also to "articulate a satisfactory explanation for its

action" that includes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983) (quotations omitted).

48. The APA separately directs courts to take a "thorough, probing, in-depth review" of agency decisions. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 104, 107 (1977). Courts review the agency action to determine whether it qualifies as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2). In reaching those determinations, courts ask whether the agency considered the "relevant factors," "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43 (quotations omitted).

49. Courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 43. They may not accept "counsel's post hoc rationalizations for agency action." *Id.* at 50. Instead, they can only uphold agencies' decisions, "if at all, on the basis articulated by the agency itself." *Id.* The APA directs courts to "hold unlawful and set aside" arbitrary and capricious decisions. 5 U.S.C. § 706.

## III. The Congressional Review Act and the Cloture Rule

50. Congress passed the Congressional Review Act as a new, easier method for overturning legislative rules. *See* 141 CONG. REC. H5099 (May 17, 1995) (statement of Rep. Gekas); 142 CONG. REC. S2312 (Mar. 19, 1996) (statement of Sen. Glenn) ("expedited legislative veto process"); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 556 (9th Cir. 2019) (*Biological Diversity*). Passed in 1996, Congress intended the Review Act as a legislative veto to

replace the one the Supreme Court struck down in 1983. *See* 142 Cong. Rec. 3122 (statement of Sen. Levin); *Chadha*, 462 U.S. 919.

51. Starting in the New Deal, as Congress delegated more authority to agencies to respond to the complexities of a growing nation, it also sought veto power over the agency rules it authorized. From 1930 to 1983, Congress inserted almost 200 "one-house veto" provisions in various delegating statutes. *Chadha*, 462 U.S. at 967 (White, J., dissenting). One-house veto provisions allowed one house of Congress, by resolution, to invalidate Executive Branch decisions or rules. *Id.* at 923 (majority opinion). In 1983, the Supreme Court overturned one-house vetoes as unconstitutional because they allowed one house to legislate without complying with Article I. *Id.* at 956-959.

52. The Review Act also unconstitutionally streamlines bills to veto agency rules subject to timing constraints. It both (a) describes the effect of future statutes passed under it and (b) designs a process for passing those future statutes.[9] If Congress and the President pass a statute that invokes specific words for a recently-passed rule, the Review Act directs courts to interpret that statute to repeal whatever statutory authority the agency could have relied on to issue that rule. *See* 5 U.S.C. §§ 801(b)(1); *Biological Diversity*, 946 F.3d at 562. The Review Act specifies these words: "That Congress disapproves the rule submitted by the _____ relating to _____ and such rule shall have no force or effect." 5 U.S.C. § 802(a). When Congress revokes statutory authority for an agency rule this way, the Review Act prohibits the agency from issuing any future rule that is "substantially the same." *Id.* § 801(b)(2).

---

[9] Although the Review Act refers to "joint resolutions," 5 U.S.C. § 802, the Constitution ignores formalistic distinctions among bills, orders, resolutions, and votes; courts focus solely on the document's function to determine whether it exercises legislative power. Art. I, § 7; *Chadha*, 462 U.S. at 946-49, 952. The Review Act process repeats the Constitutional process for passing bills, so labels are irrelevant. *See Biological Diversity*, 946 F.3d at 562.

53. The Review Act's procedures allow Congress to pass statutes to repeal agency rules with simple majorities in both houses, which evades the Senate's sixty-vote Cloture Rule to end a filibuster. *See* 142 CONG. REC. S2161 (Mar. 15, 1996) (statement of Sen. Don Nickles) ("We have expedited procedures in the bill so no one can filibuster, or stop the will of the majority. . . . People will not be able to filibuster that [bill]. So we can get it through the Senate, if you have 51 votes, and through the House if they have a majority vote, and send it to the President.").

54. To close debate on most bills and thereby to allow the Senate to vote, the Senate's Cloture Rule requires sixty votes on a cloture motion. Since the Senate changed its cloture rules in 1975, filibusters have not worked like the talking filibuster in MR. SMITH GOES TO WASHINGTON (Columbia Pictures 1939). VALERIE HEITSHUSEN & RICHARD S. BETH, CONG. RESEARCH SERV., FILIBUSTERS AND CLOTURE IN THE SENATE ii (Apr. 7, 2017). The term "filibuster" in the Senate refers broadly to various "dilatory or obstructive tactics to block a measure by preventing it from coming to a vote." *Id.* at ii. Under the pre-1975 rule, while a senator held the floor, the Senate rules could not stop the senator from holding the floor, and to vote on any measure, without a vote from two-thirds of the Senators to. *Id.* at 9. Since 1975, the Cloture Rule requires three-fifths of the senators (usually 60) to close debate—regardless of whether any Senator is speaking.

55. The Congressional Research Service recognizes that "[t]hreatened filibusters on motions to proceed once were rare but have become more common in recent years." *Id.* 10. As threatened filibusters increased, the number of cloture votes increased eightfold.[10]

56. Today, no legislation passes the Senate when forty-one senators do not consent. Congress's specialists and the Supreme Court acknowledge that bills do not pass the Senate

---

[10] U.S. Senate, Cloture Motions, senate.gov/legislative/cloture/clotureCounts.htm.

*Citizens for Constitutional Integrity v. OSMRE*, No. 1:21-cv-923-RM-STV
Pls.' Am. Compl. and Pet. for Review of Agency Action                    14

without sixty votes to invoke cloture: "when the requisite support cannot be assembled to invoke cloture . . ., the measure . . . that is being filibustered will not receive chamber approval . . . ." FILIBUSTERS AND CLOTURE IN THE SENATE 18. That creates a sixty-vote threshold. *See King v. Burwell*, 576 U.S. 473, 492 (2015) (recognizing "the Senate's normal 60-vote filibuster requirement"). The Review Act replaces the Senate's sixty-vote threshold, with a simple-majority-vote threshold, for repealing authority for recently issued rules. 5 U.S.C. § 802(d).

## FACTUAL BACKGROUND

### I. The King II Mine expanded and caused more intense impacts as Southwest Advocates fought those impacts.

57. The King Coal Mine (King I Mine) started southwest of Hesperus, Colorado, in 1938 as a small, mom-and-pop mine. Since buying the business in 2005, GCC has expanded this once-small mine into a major coal-producing enterprise. It expanded once in 2018, and it is expanding again now with the Mine Approval.

58. In 2001, National King Coal, LLC, employed thirty-three people. Every day, eighteen to twenty-eight coal trucks, each weighing thirty tons, traveled County Road 120. In 2007, GCC expanded operations to the King II Mine: 1,224 acres southwest of King I and across County Road 120. The BLM and OSMRE expected the company had enough coal to mine there until 2026, but the company finished by 2009. That shortened time frame resulted from GCC mining more coal faster. In 2000, King I produced approximately 160,000 tons of coal. By 2014, the company was mining *six times as much*. By 2022, it may produce *seven times as much*.

59. Now, GCC is further expanding with a 2,462-acre Dunn Ranch lease. In contrast to the 18-28 trucks driving on County Road 120 in 2001, GCC anticipates 120 trucks hauling coal, "around the clock" to their cement plants—either directly or by train via the Gallup, New

Mexico, BNSF Railway Co. terminal. Between the Modification and the Dunn Ranch Lease, GCC intends to continue operating the King II Mine until 2043.

60. For years, Southwest Advocates fought the Mine expansion's impacts on the local community in front of the La Plata County Commission, and submitted comments to OSMRE on the Dunn Ranch Lease. Members watched this Mine change their homes and their ways of life.

61. As SMCRA's citizen-suit provision requires, in October 2020, Citizens sent a sixty-day-notice letter to OSMRE, Ex. 2. *See* 30 U.S.C. § 1270.

**II. The Stream Protection Rule resulted from over thirteen years of analysis.**

62. In the meantime, OSMRE was completing a thirteen-year effort, culminating in the 2016 Stream Protection Rule, which overhauled the entire SMCRA regulatory regime. That saga begins with a relatively modest, 2004 proposal related to mine waste and streams, and it ends with Congress unconstitutionally rescinding authority for the 2016 Stream Protection Rule.

63. In 2004, OSMRE proposed the Excess Spoil; Stream Buffer Zones; Diversions Rule, 69 Fed. Reg. 1,036 (Jan. 7, 2004). There, the agency sought to reconsider and to minimize effects on streams from mining companies depositing waste materials next to streams. *Id.*; *see* 30 C.F.R. § 710.5 (defining spoil and overburden). Instead of immediately issuing a final rule, however, OSMRE concluded that it could better assess alternatives in an environmental analysis. Notice of Intent to Prepare an Envtl. Impact Statement, 70 Fed. Reg. 35,112 (June 16, 2005).

64. Three years later, OSMRE issued an expanded new rule that amended the SMCRA regulations related to streams and coal-mine waste material. Excess Spoil, Coal Mine Waste, and Buffers for Waters of the U.S., 73 Fed. Reg. 75,814 (Dec. 12, 2008). Ten environmental groups challenged that rule. *Nat'l Parks Conservation Ass'n v. Jewell* (*NPCA*), 62 F. Supp. 3d 7 (D.D.C. 2014); *Coal River Mountain Watch v. Jewell*, No. 1:09-cv-115-BJR (D.D.C. Jan. 16, 2009). After six years of litigation, OSMRE confessed legal error for failing to consult with the Fish and

Wildlife Service on impacts to species listed under the Endangered Species Act, 16 U.S.C. §§ 1531-1544. *NPCA*, 62 F. Supp. 3d at 11.

65. On remand, OSMRE again expanded the scope and reach of the proposed rule in the Stream Protection Rule. 80 Fed. Reg. 44,436 (July 27, 2015). This time, OSMRE proposed revising its regulations, based on "advances in science" and other new information, "to improve the balance between environmental protection and the Nation's need for coal as a source of energy." *Id.* It sought "to update and revise the [SMCRA] regulations to reflect the best available science in order to avoid or minimize these negative impacts and provide regulatory certainty to industry." Stream Protection Rule Record of Decision 1 (Dec. 2016), https://www.osmre.gov/programs/rcm/docs/sprROD.pdf. Members of the public and government agencies sent 94,000 written or electronic comments. Stream Protection Rule, 81 Fed. Reg. at 93,070. OSMRE considered them and incorporated them into the final Stream Protection Rule. The Stream Protection Rule fundamentally changed the SMCRA regulations.

66. As part of the rulemaking process, OSMRE identified voluminous benefits from the Stream Protection Rule. OSMRE predicted that, from 2020 to 2040, the Rule would

- restore 462 miles intermittent and perennial streams,

- improve water quality in 5,523 miles of intermittent and perennial streams downstream of mine sites,

- protect 84 miles of intermittent and perennial streams from excess spoil fills or coal mine waste facilities, and

- improve reforestation on 51,828 acres of mined land.

*Id.* at 93,069 (22 miles, 263 miles, 4 miles, and 2,486 acres, respectively, each year multiplied by 21 years).

67. OSMRE concluded in 2016 that the Stream Protection Rule will create 280 jobs. *Id.* The rule will reduce greenhouse gas emissions by 2.6 million short tons in one year, which OSMRE

projects will benefit the United States by $57 million each year in reduced carbon dioxide emissions. *Id.*

68. OSMRE concluded that the Stream Protection Rule would "better protect the water resources needed by current and future generations for drinking, recreation, and wildlife from the adverse effects of coal mining." *Id.* at 93,073. It concluded that, "[e]ven if [lower impacts on water resources] were the only benefits of the Rule, and they are not, the benefits to water resources alone are sufficient to support and justify a nationwide rulemaking." *Id.*

**III. Congress used the Review Act's legislative shortcut to withdraw OSMRE's authority for the Stream Protection Rule.**

69. OSMRE issued the Stream Protection Rule in December 2016. *Id.* at 93,066. In February 2017, the House approved House Joint Resolution 38. Pub. L. No. 115-5, 131 Stat. 10 (Feb. 16, 2017). The Senate approved it the next day by a vote of 54 to 45. 163 CONG. REC. at S632. The President signed it two weeks later. 131 Stat. 10. That statute would not have passed without the Review Act because it would not have received the sixty votes to invoke cloture. Forty-five senators voted against it. Later in 2017, OSMRE withdrew the Stream Protection Rule from the Code of Federal Regulations with another Federal Register notice.[11]

**IV. The King II Mine Seeks to Expand Twice.**

70. With the Stream Protection Rule out of the way, GCC wasted no time in seeking to expand the King II Mine twice: in 2017 and in 2018.

71. In March 2017, GCC submitted to OSMRE the Modification permit application package to revise the King II Mine permit to mine 950.55 additional acres. Ten months later, in January 2018, GCC submitted to OSMRE a Lease by Application package for the Dunn Ranch lease, to

---

[11] Congressional Nullification, 82 Fed. Reg. 54,924.

*Citizens for Constitutional Integrity v. OSMRE*, No. 1:21-cv-923-RM-STV
Pls.' Am. Compl. and Pet. for Review of Agency Action                                          18

allow GCC to mine 2,462 acres adjacent and northwest of the King II Mine. Interior approved that mining plan in the Mine Approval.

## COUNT 1

72. Citizens hereby adopts by reference the previous paragraphs.

73. On their faces, the Congressional Review Act and the Cloture Rule, together, violate the equal protection in the Fifth Amendment by protecting citizens differently depending on the type of statute that protects them.

74. They treat differently (a) citizens protected by statutes that delegate authorities to agencies and (b) citizens protected by other statutes. The Review Act therefore takes away equal protection of the laws from Southwest Advocates and other citizens.

75. The Stream Protection Rule protected the waters of the United States. By unconstitutionally depriving Southwest Advocates and other citizens of equal protection under the law, the Review Act and the Cloture Rule violate the equal protection guarantee in the Fifth Amendment. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213-18 (1995).

76. Applying an unconstitutional law resulted in OSMRE failing to apply the Stream Protection Rule to the Mine Approval, and therefore violated SMCRA. Because OSMRE applied the wrong law, SMCRA and the APA require the Court to hold the Mine Approval unlawful. *See NLRB v. Brown*, 380 U.S. 278, 292 (1965) ("Courts must, of course, set aside [agency] decisions which rest on an erroneous legal foundation.") (quotations omitted); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("if the action is based upon a determination of law . . ., an order may not stand if the agency has misconceived the law."); *Marbury v. Madison*, 5 U.S. 137.

## COUNT 2

77. Citizens hereby adopts by reference the previous paragraphs.

78. On its face, the Congressional Review Act violates substantive due process in the Fifth Amendment because the Review Act fails the rational basis test.

79. Without evidence of agency bad faith or any reasonably calculated possibility that a lower voting threshold would cure that bad faith, no rational basis exists for reducing the voting threshold for withdrawing statutory delegations to agencies.

80. Moreover, changing the Constitutional thresholds for passing laws does not qualify as a legitimate government objective because it violates Article I, Section 7.

81. Applying an unconstitutional law resulted in OSMRE failing to apply the Stream Protection Rule to the Mine Approval and therefore violated SMCRA. Because OSMRE applied the wrong law, SMCRA and the APA require the Court to hold the Mine Approval unlawful. *See NLRB*, 380 U.S. at 292; *Chenery Corp.*, 318 U.S. at 94; *Marbury v. Madison*, 5 U.S. 137.

### COUNT 3

82. Citizens hereby adopts by reference the previous paragraphs.

83. On their faces, the Review Act and the Cloture Rule, together, violate the separation of powers. They create a one-way ratchet that, over time, erodes and chips away at the executive power in Article II, Section 1.

84. The Executive Branch obtains power from exactly two sources: (1) the Constitution, and (2) statutory delegations. The Review Act, over time, reduces statutory delegations by making it easier to rescind them, even as the Cloture Rule makes it harder to expand them.

85. Moreover, the one-way ratchet erodes the President's ability to legislate granted by Article I, Section 7.

86. The separation of powers prohibits Congress from creating legislative structures that erode or undermine another branch. The Review Act and the Cloture Rule, together, violate the separation of powers principles by hobbling the Executive Branch.

87. Applying an unconstitutional law resulted in OSMRE failing to apply the Stream Protection Rule to the Mine Approval and therefore violated SMCRA. Because OSMRE applied the wrong law, SMCRA and the APA require the Court to hold the Mine Approval unlawful. See *NLRB*, 380 U.S. at 292; *Chenery Corp.*, 318 U.S. at 94; *Marbury v. Madison*, 5 U.S. 137.

## COUNT 4

88. OSMRE violated SMCRA and its pre-Stream Protection Rule regulations by inaccurately determining the Mine's impacts on surface water and groundwater volumes. SMCRA contains strict instructions to assess any impacts a mine could have on surface streams and groundwater. "If an agency fails to examine the relevant data—which examination could reveal, *inter alia*, that the figures being used are erroneous—it has failed to comply with the APA." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015). Courts overturn agency actions, like this, with "unexplained inconsistencies." *Id.* at 58.

89. SMCRA directs OSMRE to minimize disturbances to the quantity of surface water and groundwater during coal mining. 30 U.S.C. §§ 1265(10) ("minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations . . . ."), 1266(b)(9); 30 C.F.R. §§ 784.14(f) (2015) (requiring OSMRE to assess "the probable cumulative hydrologic impacts (CHIA) of the proposed operation and all anticipated mining upon surface- and ground-water systems in the cumulative impact area"), 784.22(a)(1) (requiring OSMRE to determine "the probable hydrologic consequences of the

operation upon the quality and quantity of surface and ground water in the permit and adjacent areas . . . ."). SMCRA also requires OSMRE to "preserv[e] throughout the mining and reclamation process the essential hydrologic functions of alluvial valley floors in the arid and semiarid areas of the country . . . ." 30 U.S.C. §§ 1265(10)(F).

90. To determine how much water the Mine would use, OSMRE relied on the Colorado Water Court's calculations of the volume of water the Mine bought from the Huntington farm to control coal dust. Dunn Ranch EA 2-8. But the EA talks out of both sides of its mouth when it analyzes the Mine's water use.

91. OSMRE makes inconsistent statements on the Mine's effects on groundwater. The EA emphasizes in italics: "*No groundwater is used at the mine.*" *Id.* But earlier in the same paragraph it recognizes that the Mine will use "well water." *Id.* Indeed, the water court awarded a "Conditional Ground Water Right-GCC Well Field." *In re GCC Energy, LLC*, No. 07CW100, ¶ 7 (Colo. D. Ct. Water Div. 7 Apr. 20, 2011); *In re GCC Energy, LLC*, No. 2015CW3029, ¶ 6.2 (Colo. D. Ct. Water Div. Jan. 6, 2017). In the GCC Well Field, the water court authorized "up to three ground water wells." No. 07CW100, ¶¶ 7.1, 7.2. And the Mine will use that groundwater for mining: "The water diverted out-of-priority by the GCC Well Field will be used for commercial/industrial, and domestic purposes at the GCC mining facility . . . ." *Id.* ¶ 9.4. The EA inaccurately and inconsistently misstates the Mine will not use groundwater. OSMRE misrepresented the project to the public and to the decisionmaker. The decisionmaker acted arbitrarily and capriciously by failing to resolve that inconsistency. OSMRE thus failed to accurately determine the Mine's effect on groundwater quantity.

92. OSMRE made another inconsistent statement on surface water. In the EA, OSMRE first explains that the Mine would use 34.07 acre-feet based on drying up 44 acres at the Huntington

farm. Dunn Ranch EA 2-8. Then, later on the same page, it concludes that the Mine would use "14.07 acre-ft of water . . . from the Huntington Ditch each year for mining dust suppression and bath house facility operational use. This is equivalent to six acres of seasonal irrigation for hay/grass." Among these inconsistent statements, not OSMRE, not the public, and not the decisionmaker who approved the Dunn Ranch coal mine expansion could have understood the Mine's actual effects on surface water quantity. By failing to accurately determine the Mine's effect on groundwater quantity, OSMRE failed to show a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

93. Finally, the water court calculated the volume of water it allocated to the Mine "not based on *historic* monthly CCU [used], but rather [on] the actual daily [volume] *available* for the [Huntington farm's] 44 Acres based on water availability . . . ." *In re GCC Energy, LLC*, No. 2015CW3029, ¶ 6.1.8(e) (emphases added); *In re GCC Energy, LLC*, No. 07CW100, ¶ 6.8.4 (Colo. D. Ct. Water Div. 7 Apr. 20, 2011) (same for nine acres), ECF No. 1-13. This subtle switch led to lower flows in the La Plata. OSMRE failed to recognize that subtle switch that allowed GCC to use more surface water than the Huntington farm used and resulted in less water in the La Plata.

94. When OSMRE approved the Dunn Ranch application, OSMRE did not know how much water the Mine was using. It inaccurately stated that the Mine would use no groundwater. It inconsistently stated the acre-feet of surface water that the Mine would use. Therefore, OSMRE violated the APA by offering an explanation contrary to the evidence before it. *See State Farm*, 463 U.S. at 43. OSMRE violated SMCRA and the APA by using inaccurate data, by making inconsistent statements, and by failing to explain the distinction between actual use and authorized use. *See Dist. Hosp. Partners*, 786 F.3d at 57 (D.C. Cir. 2015); *Cure Land, LLC v.*

*USDA*, 833 F.3d 1223, 1232 (collecting cases), 1232 n.6 (10th Cir. 2016) ("a failure to explain inconsistencies between those documents could preclude an agency from articulating the requisite rational connection between the facts found and the decision made, thereby rendering that agency's decision arbitrary and capricious." (quotations and citation omitted)); *see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 856 (10th Cir. 2019) (overturning an agency decision when the plaintiffs established a "difference between the water use contemplated in the 2003 EIS and the water use associated with drilling").

## COUNT 5

95. OSMRE also violated SMCRA and its pre-Stream Protection Rule regulations by failing to consider the lost groundwater from changing the surface water use from irrigation at the Huntington farm to industrial uses at the Mine. *See* Harris Water Eng'g, Inc., GCC Energy Mine, Substitute Water Supply Plan 7 (Oct. 8, 2015), ECF No. 1-14. Intercepting the irrigation water decreased the quantity of irrigation water that reached groundwater aquifers.

96. Again, SMCRA's regulations require OSMRE to calculate the impact of mining on groundwater quantity. 30 U.S.C. §§ 1265(10), 1266; 30 C.F.R. §§ 784.14(f) (2015) (requiring OSMRE to assess "the probable cumulative hydrologic impacts (CHIA) of the proposed operation and all anticipated mining upon surface- and ground-water systems in the cumulative impact area", 784.22(a)(1) (requiring OSMRE to determine "the probable hydrologic consequences of the operation upon the quality and quantity of surface and ground water in the permit and adjacent areas . . . .").

97. Crops never consume all of the irrigation water. Some water sprayed on crops infiltrates through the ground and replenishes groundwater sources. The water court tracked irrigation water that might have returned to Hay Gulch as surface water, but OSMRE never accounted for

irrigation water that could have infiltrated through the Huntington farm fields to replenish aquifers below. Therefore, OSMRE failed to account for lost groundwater when the Mine diverted water from the Huntington farm to the Mine.

98. When OSMRE approved the permit, it did not know how much water was infiltrating into the ground from the Huntington farm's irrigation. Thus, it "entirely failed to consider an important aspect of the problem . . . ." *State Farm*, 463 U.S. at 43. Because OSMRE never considered lost groundwater replenishment from diverting surface water that was irrigating the Huntington farm to coal-dust suppression at the Mine, OSMRE acted arbitrarily and capriciously and violated SMCRA and the APA.

## PRAYER FOR RELIEF

99. Citizens requests the following relief:

a. Declare unconstitutional and void the two-tier structure for passing bills, under the Congressional Review Act and the Cloture Rule.

b. Declare the Stream Protection Rule, 81 Fed. Reg. 93,066 (Dec. 20, 2016), valid and enforceable against the United States and the respective defendants.

c. Vacate and set aside the Dunn Ranch Mine Approval.

d. Remand the Dunn Ranch Mine Approval for reconsideration consistent with the Stream Protection Rule.

e. Remand the Dunn Ranch Mine Approval for reconsideration consistent with SMCRA and its pre-Stream Protection Rule regulations.

f. Enjoin all mining activities under the Dunn Ranch Mine Approval until the Agencies comply with the Constitution, SMCRA, the Stream Protection Rule, the pre-Stream Protection Rule regulations, and the APA.

g. Issue temporary relief that stops the Mine under 30 U.S.C. § 1276(c) until the Court rules on a final remedy.

h. Award attorney fees and costs in favor of Citizens for Constitutional Integrity and Southwest Advocates, Inc.

i. Any other and further relief as the Court concludes necessary or appropriate.

Dated September 15, 2021,

_/s/ Jared S. Pettinato_
JARED S. PETTINATO
The Pettinato Firm
3416 13th St. NW, #1
Washington, DC 20010
(406) 314-3247
Jared@JaredPettinato.com

Attorney for Plaintiffs
